IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

SANDRA M.,
    Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,
    Defendant.

Case No. 4:19-cv-04085-SLD-JEH

**Report and Recommendation**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 10) and the Defendant's Motion for Summary Affirmance (Doc. 12). This matter has been referred for a report and recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be denied and the Defendant's Motion for Summary Affirmance be granted.[1]

**I**

Sandra filed an application for disability insurance benefits (DIB) on January 6, 2015, alleging disability beginning on February 10, 2014. Her claim was denied initially on June 3, 2015 and upon reconsideration on October 30, 2015. Sandra filed a request for hearing concerning her DIB application which was held on July 12, 2017 before the Honorable Dennis LeBlanc (ALJ). At that hearing, Sandra was represented by an attorney and Sandra and a vocational expert (VE) testified. Following the hearing, Sandra's DIB claim was denied on November 15, 2017. Her

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears at (Doc. 6) on the docket.

1

request for review by the Appeals Council was denied on February 23, 2019, making the ALJ's Decision the final Decision of the Commissioner. Sandra filed the instant civil action seeking review of the ALJ's Decision on April 23, 2019.

II

At the July 2017 hearing, Sandra was 62 years old and lived in a house with her husband. On February 10, 2014, Sandra had a stroke. AR 33. She claimed the effects of stroke limited her ability to work. AR 172. She previously worked as a grain elevator operator and a hospital cook. AR 35.

Sandra testified that things had gotten better since her stroke in February 2014. As a result of her stroke, she had problems with double vision, anxiety, depression, and dizziness. She said she experienced dizziness three to four times a day when she stood up and it lasted for five to 10 minutes. She explained her double vision "makes it like it's all dizzy." AR 37. She experienced true double vision two or three times a day which lasted 10 to 15 minutes. She said it affected her ability to walk in that she became off balance. She said "[m]ost of the time" she could tell which one of the images she saw was the one she needed to reach for when handling or reaching for things. AR 38. She described her double vision at times to cause "ghosts" which was "like an extra layer or something." *Id*. She could tell which image was the real one. Sandra drove "[m]aybe once a day or twice a week." AR 39. As for whether she was supposed to drive, Sandra answered, "They didn't say I couldn't." *Id*. She drove by closing one eye, though she could not drive at night because headlights blinded her.

Sandra further testified that she had weakness in her arms, neck, and legs since her stroke, and she had low energy. She testified that she tried to vacuum, do laundry, and cook but those activities wore her out and her neck would start to hurt. She would have to take a break after doing those activities for several minutes. Her husband did the laundry because it was in the basement and she

was afraid she would fall down the basement stairs. She used a shower chair since her stroke. Though she stumbled two or three times a day when she walked around her house, she had not actually fallen while walking around it. She thought she had coordination problems because of her stroke. Sandra believed she could sit three to four hours a day, with breaks to stand or lay down, and stand four hours a day, with breaks to sit or lay down.

Upon questioning by the ALJ, Sandra testified that her neck started to hurt in the shoulder area if she lifted more than eight pounds. She said leg cramps kept her from sitting longer than 30 minutes to an hour and dizziness kept her from being on her feet for more than 20 minutes. She confirmed she became dizzy from going up a regular flight of stairs. She said particularly hot weather tended to bring on dizziness. She said she would be unable to do her past work as a kitchen cook because she would be unable to lift pots, turn burners off and on, and put produce away.

The VE was then asked whether a hypothetical individual the same age as Sandra and with the same level of education and past work as she who was able to perform medium exertional work, who was not able to climb ladders, ropes or scaffolds or balance, who would have limited depth perception, who would not be able to drive as part of her work duties, who would need to avoid hazards such as dangerous machinery and unprotected heights, and who would be capable of performing simple and routine tasks throughout the day would be able to perform any unskilled, medium occupations in the national economy. The VE answered hand packer, cleaner I, and lamination assembler would be appropriate positions for the hypothetical individual. If the hypothetical individual would have to be able to sit down at her workstation at an unscheduled, unpredictable rate for approximately 10 minutes and be off-task for the entire 10 minutes, the individual

would not be able to perform any unskilled medium occupations on a competitive basis.

### III

The ALJ determined Sandra had the following severe impairments: visual disturbance and residuals post cerebrovascular accident. AR 17. The ALJ made the following residual functional capacity (RFC) finding:

> [C]laimant has the [RFC] to perform medium work as defined in 20 CFR 404.1567(c) except the claimant cannot climb ladders, ropes, or scaffolds. She can never balance and has limited depth perception. The claimant cannot drive as part of her work duties, cannot have exposure to hazards, and is limited to performing simple, routine tasks.

AR 20.

The ALJ detailed Sandra's hearing testimony as to double vision and its effect on her ability to walk and balance as well as her low energy since her February 2014 stroke. The ALJ also pointed out that the record indicated Sandra was hospitalized with a stroke in February 2014 at which time she complained of fatigue, double and blurry vision, and bilateral leg weakness. The ALJ highlighted a record which provided that Sandra reported she was doing well with no double vision just five days after her stroke. Examinations in the record indicated normal range of motion and gait. The ALJ summarized physical consultative examiner Joseph J. Kozma, M.D.'s September 17, 2015 examination of Sandra which resulted in the following impression: Mild residuals of cerebral vascular accident; Mild memory loss; Impaired vision in the left eye; and Weakness of the lower extremities, cause undetermined. AR 434.

The ALJ concluded Sandra's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record "for the reasons explained

4

in [his] Decision," and Sandra's treatment records were inconsistent with the alleged severity of her impairments. AR 21. As for the opinion evidence, the ALJ gave "partial weight" to State Agency physician Neal Bente, M.D.'s October 29, 2015 opinion that Sandra had no exertional limitations and could occasionally climb ramps, stairs, ladders, ropes, scaffolds, and occasionally balance. AR 21. Dr. Bente indicated she had limited visual acuity and must avoid concentrated exposure to hazards. The ALJ explained Dr. Bente failed to take into consideration Sandra's exertional limitations caused by her physical impairments, thus his opinion was entitled to only partial weight. The ALJ gave "great weight" to the consultative examination performed by Dr. Kozma. AR 22. The ALJ explained, "Although Dr. Kozma failed to provide an opinion as to the claimant's physical limitations, his examinations were still considered in determining the [RFC] above." *Id*. The ALJ concluded that the RFC:

> adequately accounts for the claimant's physical impairments. The claimant's ability to perform work at the medium exertional level with the postural, environmental, visual, and mental limitations provided above takes into account her symptoms including fatigue, double vision, and bilateral leg weakness.

*Id*.

## IV

Sandra argues that the ALJ committed reversible error when he did not meet his burden of proof at step five showing other jobs exist in the national economy Sandra could perform.

## A

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. § 404.1566. The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2)  suffers from an impairment that is severe and meets a durational requirement, or suffers from a combination of impairments that is severe and meets the durational requirement;

3)  suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4)  is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5)  is unable to perform any other work existing in significant numbers in the national economy.

*Id.* An affirmative answer at steps 3 or 5 leads to a finding that the plaintiff is disabled. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. *Id.* However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

In the instant case, Sandra claims error on the ALJ's part at step four.[2]

## B

Sandra argues the ALJ failed to meet his burden of proof showing that she would be able to work eight hours a day five days a week at a medium exertional level. She specifically argues the ALJ failed to provide evidence to discredit her testimony, the fact is there was evidence of record to corroborate her testimony, the weight the ALJ assigned opinion evidence was illogical, and the ALJ

---

[2] As the Commissioner points out, Sandra argues the ALJ erred at step five though the real crux of her argument is that the ALJ erred at step four.

improperly considered her activities of daily living. The Commissioner argues the ALJ reasonably concluded the treatment records did not support a disability finding, the opinion evidence supports the ALJ's RFC determination, the ALJ was not required to accept all of Sandra's allegations, the restrictions the ALJ included in the RFC find support in the record whereas greater restrictions were not warranted, and, overall, Sandra mistakenly insists that it was the ALJ's burden to show that she could work full-time at the level outlined in the RFC.

An RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p; *see also Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) ("In assessing the claimant's RFC, the ALJ must consider both the medical and nonmedical evidence in the record"). Here, the Court can easily trace the path of the ALJ's reasoning from the medical and nonmedical evidence of record to the RFC finding. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning"). The ALJ made it abundantly clear that medical evidence of normal musculoskeletal examinations throughout the record and a consultative examiner's diagnoses of mild residuals of cerebral vascular accident, mild memory loss, impaired vision in the left eye, and weakness of the lower extremities coupled with Sandra's stated ability to prepare her own meals, drive a car, and perform some housework led him to find that Sandra remained able to perform medium exertional level work.

As for Sandra's contention that the ALJ failed to provide evidence to discredit her testimony, he pointed to medical evidence of normal examination, Sandra's own statements as to her daily activities, and medical doctors'

consideration of her impairments. Physical consultative examiner Dr. Kozma indicated Sandra had just "mild musculoskeletal problems in that she has difficulty negotiating a flight of stairs because of weakness in her lower extremities." AR 22 (citing AR 433). State Agency reviewing Dr. Bente determined Sandra was not disabled as she had no exertional limitations and could occasionally climb ramps, stairs, ladders, ropes, scaffolds, could occasionally balance, had limited visual acuity, and must avoid concentrated exposure to hazards.

As for Sandra's contention that there was, in fact, evidence of record to corroborate her testimony, the ALJ did not entirely disregard her testimony and statements regarding her vision symptoms where he included in the RFC that Sandra had limited depth perception and he precluded Sandra from driving as part of her work duties. While he recited her testimony and statements that she experienced double vision and blurry vision, the ALJ also considered the following evidence of record: Sandra's statement to Dr. Kozma that her double vision slowly cleared up following her February 2014 stroke; during Dr. Kozma's examination, Sandra had 20/20 visual acuity with her glasses though she had to close her left eyelid to see clearly because her left eye vision was blurry; Sandra reported no double vision as of February 15, 2014 (just a few days after her stroke); Dr. Bente identified Sandra's limited visual acuity; and Dr. Kozma identified Sandra's impaired vision in the left eye.

The additional evidence from the record Sandra cites in her Motion for Summary Judgment – March 2016 and 2017 McDonough Eye Associates records – provides that Sandra complained of difficulty driving and did not drive at night due to headlights, she said she had double vision at times and if she closed one eye it helped, and her visual acuity decreased from 20/20 to 20/25 from 2016 to 2017. That evidence provides much the same information as that which the ALJ

explicitly discussed in his Decision. The ALJ was not required to discuss every piece of evidence. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("an ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion"). Moreover, Sandra cannot seriously contend that the ALJ's failure to discuss such evidence was error where it was redundant of evidence he *did* discuss and his RFC finding highlighted Sandra's limited depth perception and precluded her from driving as part of her work duties.

As for Sandra's contention that the weight the ALJ assigned opinion evidence was illogical, the Court again has no difficulty in following the path of the ALJ's reasoning. The ALJ explained, "Although the postural, environmental, and visual limitations provided by Dr. Bente are generally consistent with the overall medical evidence of record, he failed to take into consideration the claimant's exertional limitations caused by her physical impairments." AR 21-22. The ALJ then cited Sandra's February 2014 stroke, her complaints of fatigue, double vision, and bilateral leg weakness at that time, and her observed gait as staggering at times at her September 2015 mental status examination. The ALJ's determination that Dr. Bente's postural, environmental, and visual limitations were consistent with the overall medical evidence is substantially supported by the record evidence of normal musculoskeletal examinations, including normal gait, and the record evidence of Sandra's impaired vision in the left eye. The ALJ did not commit error by parting with Dr. Bente's opinion in its entirety where the final responsibility for deciding Sandra's RFC was reserved for the Commissioner. *See* 20 C.F.R. § 404.1527(d)(2) (providing that the final responsibility for deciding a claimant's RFC is reserved to the Commissioner).

Sandra assigns fault to the ALJ for giving Dr. Kozma's consultative examination report great weight where, she says, medical records conflicted with Dr. Kozma's report; he noted in the "History" section of his examination report

that Sandra's double vision "has slowly cleared up." AR 430. Sandra cites to her later complaints of ongoing double vision to medical providers and her decreased visual acuity between 2016 and 2017 eye appointments. Ultimately, there was evidence in the record that Sandra's double vision improved (her own statement three days after her February 2014 stroke and Dr. Kozma's examination report) and evidence that her double vision persisted (Sandra's own complaints). This is not a case in which the ALJ ignored an entire line of contrary evidence as he considered in the Decision Sandra's complaints of double and blurry vision. *See Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) (stating that "an ALJ may not ignore evidence that undercuts [his] conclusion"); Arnett v. Astrue, 676 F.3d 586, 592 (7th Cir. 2012) (explaining that an ALJ must connect the evidence to the conclusion, and in doing so, "may not ignore entire lines of contrary evidence"). As addressed *supra*, the ALJ gave weight to evidence of Sandra's persisting eye issues in that the RFC accounted for Sandra's limited depth perception and precluded her from driving as part of her work duties. Sandra's argument in this regard calls upon the Court to reweigh the evidence which, of course, it cannot do. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (explaining that in reviewing an ALJ's decision, the court cannot reweigh evidence, resolve conflicts in the record, decide questions of credibility, or otherwise substitute its own judgment for that of the Commissioner).

Finally, Sandra's contention that the ALJ improperly considered her daily activities gives the Court pause. Certainly, it is appropriate for an ALJ to consider a claimant's daily activities, but "this must be done with care." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). Sandra points out that she reported and testified to limitations in her performance of daily activities (e.g., she could bathe herself but had to use a shower chair, she could prepare food with help from her husband, she took breaks when doing housework). The ALJ did not include those

11

limitations in his discussion of Sandra's reported daily activities, but nor did he equate those activities with the ability to perform work. Instead, the ALJ concluded that Sandra's degree of functional ability suggested she was not limited to the extent alleged. That is a proper consideration of daily activities as part of the ALJ's broader task to evaluate the "intensity and persistence of [the applicant's] symptoms." *See* SSR 16-3p (providing that all evidence is to be considered in evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the Commissioner will also use the factors set forth in 20 C.F.R. § 404.1529(c)(3) including the claimant's daily activities). In her brief, Sandra points to her subjective statements as to the performance of her daily activities to convince the Court of the ALJ's error in his consideration of those activities. The ALJ, however, cited both Sandra's own reports, medical evidence of record, and medical doctors' opinions following review of Sandra's records. Dr. Bente noted that follow up examinations by the neurologist following Sandra's stroke in February 2014 did not report any lower extremity weakness. Dr. Kozma's examination revealed normal muscular development, no muscular wasting, and normal strength. Dr. Bente ultimately opined Sandra was not disabled. Dr. Kozma's ultimate impression was, among other things, Sandra had "Mild residuals of cerebral vascular accident." AR 79; AR 434. Sandra did not use assistive devices. On this record, there was substantial evidence to support the ALJ's determinations as to the weight to give the opinions of record, his findings as to Sandra's allegations of physical impairment, and, in turn, his ultimate RFC finding. *See Biestek v. Berryhill*, 139 S. Ct. 1148, (2019) ("And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high").

## V

For the reasons set forth above, it is recommended that: 1) the Plaintiff's Motion for Summary Judgment (Doc. 10) be denied; 2) the Defendant's Motion for Summary Affirmance (Doc. 12) be granted; 3) The Clerk of Court be directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision of the Defendant, Andrew Saul, Commissioner of Social Security, denying benefits to the Plaintiff, Sandra M., is AFFIRMED."; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on June 11, 2020.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE